UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NICHOLAS JAMES WILLING,<br><br>Petitioner,<br><br>v.<br><br>WILLIAM HUTCHINGS,[1] *et al.*,<br><br>Respondents. | Case No. 2:14-cv-01194-RFB-BNW<br><br>**ORDER** |

Petitioner Nicholas James Willing, who was sentenced to 30 to 75 years in prison after a jury found him guilty of various charges stemming from a home invasion and robbery, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (See ECF Nos. 48; 51-6.) This matter is before this court for adjudication of the merits of the remaining[2] grounds in Willing's second amended petition, which allege that the prosecution suppressed favorable evidence and he was denied an adequate opportunity to confront the prosecution's witnesses. (ECF No. 48.) For the reasons discussed below, this court denies the petition and a certificate of appealability.

**I.      BACKGROUND**[3]

On December 11, 2010, around 8:00 p.m., Susan Jones (hereinafter "Susan") was watching television in her living room with her seven-year-old daughter, M.T., while her husband, Robert Jones (hereinafter "Bob"), was in another room working on a computer when four individuals, one

---

[1] The state corrections department's inmate locator page states that Willing is incarcerated at Southern Desert Correctional Center. William Hutchings is the current warden for that facility. At the end of this order, this court directs the clerk to substitute William Hutchings as a respondent for the prior respondent Brian Williams. See Fed. R. Civ. P. 25(d).

[2] This court previously dismissed grounds 1(c), 2(c), and 3(a) as untimely. (ECF No. 98.)

[3] This court makes no credibility findings or other factual findings regarding the truth or falsity of the evidence from the state court. This court's summary is merely a backdrop to its consideration of the issues presented in the case.

of whom was wielding a shotgun, entered her residence in Pahrump, Nevada wearing black masks and black clothing. (ECF No. 50-7 at 59, 61–64, 80.) The intruders ordered Susan and M.T. to "[g]et on the floor." (Id. at 65.) While Bob was being "rough[ed] up in the hallway" after hitting one of the intruders with a pool stick, the man with the shotgun repeatedly asked Susan, "[w]here's the cash?" (Id. at 66–67.) The intruders tied Bob's hands, and Susan took the man with the shotgun to the master bedroom and opened a safe. (Id. at 67–68, 112.) The man took some silver coins and money from the safe, and after he again asked Susan where the cash was located, Susan took the man to the garage where another safe was opened. (Id. at 69–70, 73.) The intruders then obtained several hundred dollars from another room in the house, ordered Susan, Bob, and M.T. into a closet, and told them they would kill them if they called the police. (Id. at 74–75.)

The following day, a man and woman "cash[ed] in a large amount of 50-cent" coins at a store, and employees of the store called law enforcement. (ECF No. 50-8 at 63.) Detective Michael Eisenloffel with the Nye County Sheriff's Office obtained video surveillance footage from the store, and a married couple—Jamie Sexton and Dylan Spellman—were identified as the individuals who cashed in the coins. (Id. at 70, 75–76.) Sexton and Spellman were apprehended, interviewed, and "indicated that they had indeed been part of the reported robbery at [the] Jones' house." (Id. at 79.) A search warrant was executed on their residence, and law enforcement recovered a "notebook contain[ing] handwriting, which . . . appeared to be entry instructions into [the] Jones' home," "a two-page floor plan or diagram of the home," and a shotgun. (Id. at 80.) Sexton and Spellman implicated three other people in the robbery: Joshua Cotton, Jemere Reid, and Willing. (Id. at 90, 92, 99.) A search of Cotton's residence yielded money and a bandana, and a search of Reid's residence yielded money, a handgun, a black hat, and rope. (Id. at 89, 92.)

Spellman testified that he had worked as a manual laborer and Willing had been his supervisor. (ECF No. 50-8 at 122–24, 150.) Spellman testified that Willing "was the one that gave [him and Sexton] the information about where . . . the safes were [located in the Jones' residence], the layout of the house."[4] (Id. at 150.) Spellman explained that the robbery started as a joke, but "then stuff started getting more detailed." (Id. at 160.) Although Willing was not going to be present for the robbery and did not know when it was going to occur, Willing "knew it was going to happen" and promised to compensate Spellman and Sexton for committing the robbery. (Id. at 170–72; ECF No. 50-9 at 18.) Spellman and Sexton recruited Reid and Cotton to assist them in completing the robbery. (ECF No. 50-8 at 173.) Spellman, Sexton, Cotton, and Reid all pleaded guilty to second-degree kidnapping and robbery.[5] (Id. at 177.)

Bob testified that he was the public administrator and facilities manager for Nye County at the time of the robbery. (ECF No. 50-7 at 140.) Willing worked for Bob as "a Maintenance Man II in Buildings and Grounds." (Id. at 144.) Bob had directed Willing to do some groundskeeping work at a park, and Willing had been using a backhoe to complete that work. (Id. at 145.) Willing complained to Bob that he was "working out of class" by using the backhoe and "wanted to be paid as a Maintenance Man III." (Id. at 148–50.) Instead of increasing Willing's classification and compensation, Bob took "the backhoe from [Willing] and g[a]ve him a wheelbarrow." (Id. at 150.) Thereafter, Willing injured his back at the park jobsite and required surgery. (Id. at 151–52.)

---

[4] Susan and Bob testified that Willing had been to their residence several times. (ECF No. 50-7 at 78–79, 155–56.)

[5] Sexton's testimony was consistent with Spellman's testimony concerning Willing's involvement in the robbery: the robbery was conducted at Willing's behest, Willing told her and Spellman that Bob had safes and "there were over 30 gold bars in the house," Willing was going to compensate her and Spellman for the robbery, Willing told her and Spellman the layout and location of the house, Willing showed her and Spellman some pictures of the Jones' house, Willing had multiple planning sessions with her and Spellman, and Willing knew the robbery was going to happen. (ECF No. 50-9 at 42, 46–48, 50–51, 57, 63.)

Spellman and Willing's ex-girlfriend testified that Willing hated and blamed Bob for his back injury. (ECF Nos. 50-8 at 157; 51 at 7–8, 11.) And Sexton testified that Willing wanted revenge on Bob: "He said that Bob was going to pay like he was because he was out of work and he was going through financial struggles, and he wasn't able to move. He wasn't able to work. He had a hard time paying his medical bills, and he wanted revenge." (ECF No. 50-9 at 28, 44.) Sexton also testified that Willing "didn't want anything from the robbery. He just wanted . . . Bob to be robbed so that when [the robbery] was investigated," it would be clear that Bob "was stealing from the County and that there would be things in his house that weren't supposed to be, which would help [Willing] with his lawsuit" against Bob. (Id. at 60.)

Willing was interviewed by law enforcement and "made several comments in relation to the event that he didn't intend for or didn't want Bob Jones' wife or daughter to be injured, that his . . . anger was for Bob Jones specifically." (ECF No. 50-9 at 120–21.) Willing also "eventually admit[ted] that he told [Sexton and Spellman] details about the [Jones'] house" and "admitted that he told at least two people that he would do the robbery himself except for his lawsuit." (Id. at 122, 126.) Willing testified at the trial and denied having discussions with Sexton and Spellman about robbing Jones and denied telling them to rob Jones. (ECF No. 51 at 41, 54, 70.)

A jury found Willing guilty of burglary with the use of a deadly weapon, robbery with the use of a deadly weapon, three counts of first-degree kidnapping with the use of a deadly weapon, grand larceny with the use of a deadly weapon, grand larceny of firearms with the use of a deadly weapon, battery with intent to commit grand larceny, three counts of assault with a deadly weapon, and conspiracy to commit robbery. (ECF No. 51-6.) Willing's judgment of conviction was affirmed by the Nevada Supreme Court. (ECF No. 51-19.) While his direct appeal was pending, Willing moved for a new trial based on the discovery of new evidence. (ECF No. 51-10.) The state

district court denied the motion, and the Nevada Supreme Court affirmed the denial. (ECF Nos. 51-17; 51-24.)

## II.     GOVERNING STANDARDS OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000), and citing Bell v. Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 75 (quoting Williams, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer, 538 U.S. at 75); see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.   DISCUSSION

### A.   Ground 1—suppression of evidence by the prosecution

In ground 1, Willing argues that his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecution suppressed favorable and material evidence. (ECF No. 48 at 13.) Specifically, in ground 1(a), Willing argues that the prosecution hid its agreement not to charge Sexton with an unrelated jewelry theft case in exchange for her continued cooperation and testimony against Willing. (Id. at 16.) And in ground 1(b), Willing argues that the prosecution did not disclose that Sexton's plea deal was made in exchange for her testimony against Willing. (Id. at 18–22.)

#### 1.   Background information

On December 22, 2010, a criminal complaint was filed in state justice court charging Willing, Spellman, Sexton, Cotton, and Reid with burglary with the use of a deadly weapon, three counts of robbery with the use of a deadly weapon, three counts of first-degree kidnapping with the use of a deadly weapon, grand larceny with the use of a deadly weapon, grand larceny of a

firearm with a deadly weapon, battery with intent to commit grand larceny, three counts of assault with a deadly weapon, conspiracy to commit robbery and destroying evidence.[6] (ECF No. 49-5 at 2–15.) At a preliminary hearing held for the five defendants, the prosecutor, Wesley White, represented that the State had reached negotiations with Spellman, Cotton, Sexton, and Reid: "[t]hey're going to unconditionally waive their right to preliminary hearing . . . and . . . will be pleading guilty to one count of robbery and one count of kidnapping in the second degree." (ECF No. 49-6 at 7–8.) White also represented that after Spellman, Cotton, Sexton, and Reid entered guilty pleas, "the State's going to agree to reduce bail between five and $20,000." (Id. at 8–9.) Specifically, "[t]he 5,000 bail [was] going to apply to Miss Sexton, who will be offering testimony . . . at the preliminary hearing [against Willing]." (Id. at 9.)

As agreed, at their arraignment, Spellman, Cotton, Sexton, and Reid pleaded guilty to robbery and second-degree kidnapping, and the state district court reduced Sexton's bail to $5,000 and Spellman's, Cotton's, and Reid's bail to $20,000. (ECF No. 49-10 at 19, 25.) White articulated the terms of the plea agreements at the beginning of the arraignment and stated, inter alia, that Sexton was "also going to be testifying at the trial of Willing should that become necessary, and the State reserves the right, obviously, to call any defendant in this case after they've entered their pleas." (Id. at 11.)

At the trial, during Sexton's direct examination, the following colloquy took place between White and Sexton:

> Q. Other than giving you and [Spellman] a bail reduction and allowing your sentencing to be stayed pending this trial, did the State promise you anything?
> A. No.
> Q. Did I promise you anything?

---

[6] Sexton and Spellman were also charged with burglary and an offense involving stolen property regarding the cashing of the coins. (ECF No. 49-5 at 15–16.)

|   |   |   |
|---|---|---|
| | A. | No. |
| | Q. | In fact, I'm free to stand in front of the Judge and ask for 20 years for you if I want to, aren't I? |
| | A. | Yes. |
| | Q. | Are you doing this - - are you saying these things about Nick Willing just to try to avoid going to prison? |
| | A. | No. |
| | Q. | Why are you saying them? |
| | A. | I'm telling the truth. |
| | Q. | Okay. Why are you - - or tell the jury why you want to be here to tell the truth? |
| | A. | Because I'm making my amends for my wrongs, and I feel very guilty for my part in this. |

(ECF No. 50-9 at 65–66.)

Following the jury verdict, as a part of his motion for a new trial, Willing submitted a letter allegedly written by Sexton to another person regarding, inter alia, a promise made to her by the prosecutor, Wesley White. (ECF No. 51-13 at 7–8.) In that letter, Sexton wrote, "Wes promised me I wouldn't do time but it was never written on paper so [I don't know] my outlook now." (Id. at 7.) Additionally, as a part of his motion for a new trial, Willing submitted an affidavit of Chris Rasmussen, Sexton's counsel. (ECF No. 51-14.) In that affidavit, Rasmussen indicated, inter alia, that (1) the State was investigating a "jewelry 'theft' felony case" against Sexton "during the time in which the Willing matter was being litigated," (2) Rasmussen "was under the impression that as long as Sexton continued with her cooperation, Sexton would not be charged in the jewelry theft case," (3) an interview was held between White, Sexton, and Rasmussen prior to the preliminary hearing in which "it was discussed that Sexton could avoid jail time if she was able to assist in the prosecution of Willing,"[7] (4) White later informed Rasmussen "that he would not proceed with

---

[7] Rasmussen also signed a declaration on June 30, 2016, in which he stated, inter alia, that although it was not memorialized in writing, "it was well understood by all involve [sic] that [Sexton] would only get the benefit of the deal if she testified against Nicholas Willing." (ECF No. 53-12 at 4.) This court is limited on habeas review "to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). The Nevada Supreme Court did not have Rasmussen's 2016 declaration when it affirmed the state district

[the] jewelry theft case that had been submitted by the Nye County Sheriff's Office," (5) it appeared to Rasmussen that Sexton "appeared to be the organizer" of the robbery, (6) "it was obvious to [Rasmussen] that from the discovery and Jamie Sexton's admissions to law enforcement that the only way for Sexton to avoid serving prison time would be to negotiate a deal which involved cooperation," and (7) Sexton's testimony at Willing's trial "that she had personal knowledge that Willing was involved . . . was a change from the only proffer that took place prior to the preliminary hearing." (ECF No. 51-14 at 5–6.)

In its opposition to Willing's motion for a new trial, the State included an affidavit of White. (ECF No. 51-15 at 16.) In that affidavit, White indicated, inter alia, that (1) he never promised Sexton that she would not go to prison, (2) Sexton was told that her "sentencing was up to the Judge" and White "would remain free to argue at [her] sentencing, but [he] would certainly take [her] testimony and cooperation into consideration when arguing," and (3) "[t]he entire deal for . . . Sexton . . . [was] contained in [her] Guilty Plea Agreement[ ]." (Id.) The State also included an affidavit of Tierra Jones, a deputy district attorney with the Nye County District Attorney's Office. (Id. at 13.) In that affidavit, Jones indicated, inter alia, that: (1) she "was tasked with handling most of [White's] remaining open cases" after he resigned following Willing's trial, (2) she contacted Rasmussen about Sexton's jewelry theft case before Sexton's sentencing in the robbery case, and Rasmussen "informed [her] that he had never spoken with Mr. White regarding any [jewelry theft] case and that he was not aware of any [jewelry theft] case," (3) White informed her that the jewelry theft case "was not part of any negotiations in the robbery case," and (4) she

---

court's denial of Willing's motion for a new trial in 2014. (See ECF No. 51-24.) As such, this court is prevented from considering Rasmussen's 2016 affidavit.

1  "requested that [Sexton's jewelry theft] case be denied" after she was sentenced in the robbery
2  case. (Id.)

### 2. Relevant law

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the Brady] rule." Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. Hovey v. Ayers, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Accordingly, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678).

### 3. State court determination

In affirming the denial of Willing's motion for a new trial, the Nevada Supreme Court held:

> Willing contends that the district court erred by denying his motion for a new trial because he presented newly discovered evidence that accomplice Jamie Sexton had an open felony theft case and was promised she would not be charged in that case, nor go to prison in the instant case if she testified against him. We review a district court's determination whether to grant a new trial for a clear abuse of discretion. See McCabe v. State, 98 Nev. 604, 608, 655 P.2d 536, 538 (1982).
>
> [FN1] The district court analyzed Willing's motion under Brady v. Maryland, 373 U.S. 83 (1963), rather than a motion for a new trial pursuant to NRS 176.515; however, its findings of fact and conclusions of law is a model of clarity and addresses the relevant considerations.
>
> We conclude that the district court did not abuse its discretion. The record supports the district court's determination that the evidence regarding "side deals" was not credible and Sexton testified truthfully in that regard. The record also supports the district court's determination that, even if the jury had been informed of the theft case, there was not a reasonable likelihood the result at trial would have been different because Sexton's credibility was explored at trial, other testimony incriminated Willing, and substantial evidence was presented which demonstrated that it would have been almost impossible for Sexton to plan the crimes without Willing's involvement. See Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991) (newly discovered evidence must be "not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable"); King v. State, 95 Nev. 497, 500, 596 P.2d 501, 503 (1979).

(ECF No. 51-24 at 2-3.)[8]

---

[8] Willing argues that the Nevada Supreme Court's finding that "[t]he record supports the district court's determination that the evidence regarding 'side deals' was not credible" was an unreasonable determination of the facts, so this court should review ground 1 de novo. (ECF No. 133 at 11.) This court disagrees. The state district court determined that Sexton did not have an explicit agreement with the prosecution involving "no jail time" or her jewelry theft case. (ECF No. 51-17 at 11–12.) Because the "no jail time" and dismissal of the jewelry theft case issues were not discussed (1) during the prosecutor's recitation of Sexton's plea deal at the preliminary hearing, (2) in Sexton's guilty plea agreement, or (3) at Sexton's arraignment, the Nevada Supreme Court's finding that the state district court's determination that these issues were not an explicit part of the negotiations was reasonable. (See ECF Nos. 49-6 at 8–9; 49-10 at 10–11; 51-15 at 19–21.) And even if this court were to review this ground de novo, it would fail for lack of prejudice as discussed below.

### 4. Analysis

To be sure, the following would have been favorable impeachment evidence, if proven, pursuant to Brady's first prong: (1) an agreement—whether explicit or implicit—that Sexton's jewelry theft case may be dismissed depending on her testimony at Willing's trial and her sentence for the robbery, and (2) an agreement—whether explicit or implicit—that Sexton's plea agreement, whereby multiple charges were dismissed, was contingent on her testimony against Willing. See Giglio, 405 U.S. at 154–55 (determining that a witness' credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); see also Davis v. Alaska, 415 U.S. 308, 316–17 (1974) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986) ("While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness]'s credibility, it is equally clear that facts which imply an agreement would also bear on [the witness]'s credibility and would have to be disclosed.").

Turning to Brady's second prong, suppression, neither of these alleged agreements were disclosed to the defense because the prosecution maintained that there was no agreement regarding Sexton's jewelry theft case and Sexton's plea agreement in the robbery case was contained entirely in the guilty plea agreement, which did not mention that it was contingent on her testimony against Willing.[9]

---

[9] Notably, however, the prosecutor did indicate at Sexton's arraignment that she was "going to be testifying at the trial of Willing should that become necessary." (ECF No. 49-10 at 11.)

12

1    Nevertheless, turning to Brady's third prong, prejudice, the Nevada Supreme Court reasonably determined that there was no reasonable probability the result of Willing's trial would have been different had this alleged impeachment evidence been disclosed to the defense and presented against Sexton. Bagley, 473 U.S. at 682. As the Nevada Supreme Court reasonably noted, Sexton's credibility was broadly explored by Willing's counsel at trial. Indeed, Willing's counsel impeached Sexton during cross-examination about, inter alia, (1) her lying to store employees and law enforcement about where she obtained the coins, (2) her lying to Susan twice to obtain entry into the Jones' residence prior to the robbery to gain information about the house, (3) her receiving the benefit of multiple charges being dropped as a result of her plea, and (4) her "[o]ccasionally . . . getting high" prior to getting together with Willing. (ECF No. 50-9 at 71–73, 75–77, 80.) Further, as the Nevada Supreme Court reasonably noted, Spellman testified extensively about Willing's part in the robbery and detectives testified that Willing admitted he told Sexton and Spellman details about the Jones' house and would have done the robbery himself except for his lawsuit. See Smith v. Cain, 565 U.S. 73, 76 (2012) ("[O]bserv[ing] that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); cf. Banks v. Dretke, 540 U.S. 668, 700–01 (2004) (holding that impeachment evidence was material where it pertained to a witness whose testimony, which was "uncorroborated by any other witness," was "crucial to the prosecution"); Wearry v. Cain, 577 U.S. 385, 393 (2016) (determining that there was a lack of confidence in the jury's verdict due to the suppression of evidence related to two witnesses' motivations for testifying because "the only evidence directly tying [the defendant] to th[e] crime was [one witness's] dubious testimony, corroborated by the similarly suspect testimony of [the other witness]").

13

Therefore, the Nevada Supreme Court's determination that Willing failed to demonstrate prejudice constitutes an objectively reasonable application of Brady's prejudice prong. Brady, 373 U.S. at 87; Strickler, 527 U.S. at 281–82; Bagley, 473 U.S. at 682; Kyles, 514 U.S. at 434. Willing is not entitled to federal habeas relief for grounds 1(a) or 1(b).

### B.   Ground 2—confrontation

In ground 2, Willing argues that he was denied an adequate opportunity to confront Sexton due to the prosecution's suppression of the favorable and material evidence outlined in ground 1. (ECF No. 48 at 26.) Specifically, in ground 2(a), Willing argues that the prosecution's failure to inform the defense that it did not charge Sexton in the jewelry theft case in exchange for her continued cooperation and testimony against him denied him his constitutional right to confront Sexton. (Id.) And in ground 2(b), Willing argues that the prosecution's failure to inform the defense that it allowed Sexton to plead guilty to reduced charges in exchange for her continued cooperation and testimony against him denied him his constitutional right to confront Sexton. (Id. at 29.)

#### 1.   Relevant law

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418 (1965); see also Maryland v. Craig, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth

of his testimony are tested."). While "the Confrontation Clause guarantees an opportunity for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (internal quotation marks omitted); see also Kentucky v. Stincer, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional purpose i[s] ensuring a defendant an opportunity for cross-examination."). A "defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Van Arsdall, 475 U.S. at 680.

"[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontational Clause errors, is subject to Chapman harmless-error analysis." Van Arsdall, 475 U.S. at 684. That analysis asks "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Id. The factors assessed in answering that inquiry "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.

### 2. State court determination

In affirming the denial of Willing's motion for a new trial, the Nevada Supreme Court held:

> Willing also contends that he was deprived of his right to confront Sexton. Although we need not consider this contention because it does not appear that it was raised below, see Davis v. State, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991), overruled on other grounds by Means v. State, 120 Nev. 1001, 103 P.3d 25

(2004), we note that any error would have been harmless, see Medina v. State, 122 Nev. 346, 355, 143 P.3d 471, 476 (2006).

(ECF No. 51-24 at 3 n.2.)[10]

### 3. Analysis

Assuming that Willing was prohibited from engaging in an appropriate cross-examination of Sexton due to the prosecution's failure to inform the defense about the alleged agreements—whether explicit or implicit—regarding Sexton's jewelry theft case and her robbery plea being contingent on her testimony against Willing, the Nevada Supreme Court reasonably determined that any error was harmless. Sexton's testimony was important to the prosecution's case against Willing, but it was largely corroborative of and cumulative to Spellman's testimony. Further, Sexton's testimony was only contradicted by Willing's self-serving testimony, and Willing's counsel conducted an otherwise thorough cross-examination of Sexton assessing her credibility. See Gibbs v. Covello, 996 F.3d 596, 605 (9th Cir. 2021) ("[E]ven assuming that the timing of the disclosures implicated the Confrontation Clause, the California Court of Appeal could reasonably conclude that questioning based on those disclosures would not have materially enhanced the effectiveness of the cross-examination."). Finally, the prosecution's case against Willing was strong: Sexton and Spellman would have had no knowledge about the Jones family or their residence absent Willing's instructions, Willing had a motive to have Bob robbed, and Willing made incriminating statements to law enforcement. Therefore, the Nevada Supreme Court's determination that any Confrontation Clause error was harmless constitutes an

---

[10] Willing urges this court to review ground 2 de novo because the Nevada Supreme Court did not address his Confrontational Clause claim directly and/or disregarded Supreme Court precedent. (ECF No. 133 at 16.) This court disagrees. The Nevada Supreme Court cited Medina v. State, 122 Nev. 346, 143 P.3d 471 (2006) for its determination that "any [Confrontation Clause] error would have been harmless." (ECF No. 51-24 at 3 n.2.) And, importantly, Medina addressed a Confrontation Clause error and then cited Chapman and Van Arsdall in its analysis of whether that error was harmless. Medina, 122 Nev. at 355 n.22, n.24, 143 P.3d at 477 n.22, n.24.

16

objectively reasonable application of clearly established federal law. Van Arsdall, 475 U.S. at 684. Willing is not entitled to federal habeas relief for grounds 2(a) or 2(b).[11]

## V.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Willing. Rule 11 of the Rules Governing Section 2254 Cases requires this court issue or deny a certificate of appealability (COA). This court has *sua sponte* evaluated the remaining claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this court's procedural ruling was correct. Id.

Applying these standards, this court finds that a certificate of appealability is unwarranted.

## VI.   ECF NOS. 142 and 143

This habeas matter is before the Court on counseled Petitioner Nicholas James Willing's *pro se* motion for recusal of judge and *pro se* motion for judicial review *de novo*. (ECF Nos. 142, 143.) Once an attorney has made an appearance on behalf of a party, the party may not personally

---

[11] Willing requests that this court conduct an evidentiary hearing. (ECF No. 48 at 34.) Neither further factual development nor any evidence that may be proffered at an evidentiary hearing would entitle Willing to relief. Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, it true, would entitle the applicant to federal habeas relief.").

file any document with the Court. Local Rule IA 11-6. As such, Willing's *pro se* motions are fugitive documents not properly before the Court.

## VII. CONCLUSION

**IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 48) is DENIED.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that Petitioner's *pro se* motion for recusal of judge and *pro se* motion for judicial review de novo (ECF Nos. 142, 143) SHALL BE STRICKEN as fugitive documents.

**IT IS FURTHER ORDERED** that the Clerk of the Court is to substitute William Hutchings for respondent Brian Williams, enter judgment accordingly, and close this case.

**Dated:** December 12, 2023.

RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE